## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:   DIPAKKUMAR VANMALIBHAI PATEL and                    No. 7-10-12627 JA
       PADMABEN DIPAKKUMAR PATEL,

       Debtors.

HASMUKHBHAI K. PATEL and
USHABEN H. PATEL, individually
and in their capacity as members of
ROSHAN HOSPITALITY, LLC,

       Plaintiffs,

v.                                                            Adversary No. 10-1200 J

DIPAKKUMAR VANMALIBHAI PATEL,
PADMABEN DIPAKKUMAR PATEL and
ROSHAN HOSPITALITLY, LLC,

       Defendants.

## <u>MEMORANDUM OPINION</u>

Before the Court is Plaintiffs' adversary complaint against Debtor-Defendants. Plaintiffs

assert Defendants defrauded and embezzled from them by siphoning money away from the

parties' co-owned limited liability company. Plaintiffs seek a nondischargeable judgment

against Defendants in the amount of $581,473.73 pursuant to 11 U.S.C. §§ 523(a)(2)(A) and

523(a)(4). After carefully considering the evidence and arguments, the Court concludes Plaintiff

Usha Patel is entitled to a non-dischargeable judgment in the amount of $35,946, which

represents the amount of damages stemming from her direct claims against Defendants. The

Court further concludes that to the extent Defendants siphoned funds away from the jointly

owned company, Plaintiffs cannot maintain a direct claim for those amounts.

## PROCEDURAL BACKGROUND

Plaintiffs filed this adversary proceeding in December 2010. The attorney who filed the complaint on behalf of Plaintiffs represented them for about a year. The parties conducted extensive discovery and filed various dispositive motions. After ruling on those motions, the Court set a three day trial in November 2012. By that time, Plaintiffs had new counsel. Two days into the trial, thes Court adjourned to allow Plaintiffs to supplement their expert report.

The Court reconvened the trial in January 2013. On the third day of the reconvened trial, the parties agreed to the mediation of their dispute and asked the Court to suspend the trial pending mediation. By an order entered February 19, 2013, the Court directed the parties to contact chambers staff to request a new trial setting if the mediation was unsuccessful. The mediation was unsuccessful, but the parties never requested a new trial setting. In late 2013 or 2014, Plaintiffs' then lead counsel retired. Plaintiffs' new lead counsel entered an appearance in June 2014. Around the same time, the Court conducted a status conference to get the case back on track, during which a new trial was set. The Court later continued the trial at the request of a party. The evidentiary portion of the trial finally concluded in December 2014. At the parties' request, the Court set an extended closing argument and post-trial briefing schedule. Closing argument and post-trial briefing concluded in the spring of 2015.

The evidence presented at trial created a challenging record, partly because the lengthy trial was held in segments, but largely because of the nature of the evidence. Witnesses testified at the various portions of the trial, and their testimony often conflicted. Much of the testimony focused on events that occurred five to ten years earlier. The parties introduced many thousands of pages of exhibits into evidence. Certain exhibits, such as portions of the expert report, became less helpful in light of the testimony. Other exhibits, such as accounting records

maintained by Defendants, were sometimes handwritten and unintelligible. In making its findings, the Court made numerous judgments about credibility as well as how much weight to give any particular statement or exhibit.

FINDINGS OF FACT

The parties to this case are family. Plaintiffs Ushaben ("Usha") Patel and Hasmukhbhai K. ("H.K.") Patel are married to one another, as are Defendants Dipakkumar ("Danny") Vanmalibhai Patel and Padmaben ("Patty") Dipakkumar Patel. Usha and Danny are siblings. Usha and Danny have two other sisters named Mina Patel and Daxa Patel. As explained below, Usha and Danny's relationship deteriorated after they went into business together.

A. The Roshan Entities: Formation, Operation, and the Early Years

In 2002, Usha, Mina, and Danny formed Roshan Hospitality, LLC ("Hospitality"), a limited liability company organized under the laws of the State of New Mexico. They formed Hospitality to purchase and operate a Microtel Inn in Tucumcari, New Mexico. Hospitality obtained a loan[1] from Sienna Capital to purchase the hotel. Usha, H.K., and Danny all personally guaranteed that loan.

The original members of Hospitality were Danny, Usha, and Mina. At the time of Hospitality's formation, Danny invested about $290,000 and owned a 75% interest, Usha invested about $48,000 and owned a 15% interest, and Mina invested about $32,000 and owned a 10% interest. Of the $290,000 Danny originally invested in Hospitality, $57,000 consisted of a loan from Usha. In late 2004 or early 2005, Usha and Danny purchased Mina's 10% ownership interest in Hospitality. Usha paid Mina $22,000 to acquire an additional 5% interest and loaned Danny $22,000 to allow him to acquire the remaining 5%. Going forward, Danny owned an 80% interest in Hospitality, and Usha owned a 20% interest.

---

[1] The amount of that loan is unclear.

3

In late 2004, Usha, Danny, and Mina formed another limited liability company called Roshan Foods, LLC ("Foods"). Foods obtained a loan from Tucumcari Federal Savings and Loan Association ("Tucumcari Federal") in the amount of $1,025,000 to purchase a Long John Silvers Restaurant next to the Microtel Inn. Hospitality guaranteed Tucumcari Federal's loan to Foods, as did Usha, H.K., and Danny. Foods also obtained loans - which Hospitality guaranteed - from a vendor called Manifest Funding and from Wells Fargo Bank to fund operating costs.

Danny initially owned the majority of Foods, with Usha and Mina owning a small percentage of the company. The exact initial ownership of Foods is unclear from the evidence. Usha obtained an additional 30% around 2005, and from that point forward Usha and Danny each owned a 50% interest in Foods. Early on, the parties agreed that H.K. would operate Foods. H.K. visited the Long Johns Silvers a number of times from Houston where he resided, but he never took an active role in managing the restaurant.

Usha and Danny formed one more limited liability company in late 2005 - Roshan Lodging, LLC ("Lodging") - in which they each owned a 50% interest. They formed Lodging to construct a Sleep Inn hotel in Tucumcari. To fund the purchase of raw land on which to construct a Sleep Inn, Patty and Danny caused Hospitality to refinance the Microtel Inn. Hospitality then loaned Lodging money obtained from the refinancing to purchase the land. Usha terminated her interest in Foods in mid to late 2006.[2] Patty and Danny performed some work in aid of construction of the Sleep Inn, such as commissioning architectural plans, but it was never built. Patty and Danny gave up on the project some time in 2008.

Despite their involvement in the businesses and this adversary proceeding, Patty and H.K. were never members of Hospitality, Foods, or Lodging. Patty and H.K.'s only interest in

_____

[2] The exact date is unclear. One document reflects that Danny purchased Usha's interest in June 2006. However, Danny executed a note in favor of Usha on December 31, 2006, and this also apparently represented the termination of her interest in Lodging.

those entities was a community property interest in their spouse's interest. Together, Hospitality, Foods, and Lodging will hereinafter be referred to as the "Roshan Entities." The entities were named after Patty and Danny's child, Roshan.

When the Roshan Entites were formed, Usha and H.K. lived in Houston. Patty and Danny lived in Tucumcari and were primarily responsible for operating the businesses. Danny provided management and maintenance services for the Microtel Inn, while Patty kept all books and records and sometimes worked at the front desk. Each day Patty or other Hospitality employees prepared a report summarizing information contained in the receipts of the Microtel Inn (the "Daily Report"). Patty also prepared a monthly report of receipts using the Daily Reports (the "Monthly Report"). Monthly reports were transmitted to Hospitality's accountant for the purpose of preparing its tax returns. Patty also worked at Foods' business, the Long John Silvers, as necessary.

Patty and Danny oversaw all of the Roshan Entities, but they received compensation only from Hospitality. There is no written contract between the parties regarding the amount of Patty and Danny's compensation, although Hospitality's Operating Agreement permits Hospitality to compensate members for services rendered to or on behalf of the company. However, the members did orally agree amongst themselves on the amount of Patty and Danny's salary. Their salary was initially booked as compensation. Later, it was booked as a "guaranteed payment to partner."

When Hospitality was formed, its members orally agreed that Patty and Danny's combined salary would be $3,000 per month. Around 2004 or 2005,[3] the members orally agreed such salary would be increased to $5,000 per month. Usha agreed to such increase as a

---

[3] The Court cannot make a more specific finding regarding when this occurred due to conflicting testimony.

concession because she purchased an additional 5% interest in Hospitality from Mina when Danny had originally planned to purchase Mina's entire 10% interest for himself. After the increase to $5,000 per month, Usha did not consent to any additional increases in Patty and/or Danny's salary. In addition to their salary, Patty and Danny also collected about $500-$1000 in hourly wages every two weeks for working at the front desk of the Microtel Inn. It is unclear whether Usha and H.K. were aware of or consented to payment of hourly wages in additional to the salary.[4]

Patty and Danny operated the Roshan Entities in a highly informal fashion. The Roshan Entities' assets were often commingled among Hospitality, Foods, and Lodging and sometimes with Patty and Danny's personal assets. When a debt of Foods became due, for example, it was not unusual for Patty and Danny to cause Hospitality to pay it, and vice versa. Neither Hospitality nor the Microtel Inn ever had a credit card in its own name. Patty and Danny often payed company expenses with their personal credit cards. Hospitality did have a bank account at Wells Fargo. In the early years Patty often deposited receipts from the Microtel Inn into Hospitality's account, but sometimes she deposited the receipts into her personal account. The same was true of payments made on behalf of Hospitality: sometimes such payments were made from the company's Wells Fargo account, and sometimes they were made from Patty and Danny's personal account.

Usha had access to Hospitality's Wells Fargo account, but she never checked it. She and H.K. did not take an active role in overseeing the Roshan Entities, nor did they inquire about their financial stability in the early years. Between 2003 and about 2007, Usha received

---

[4] Usha testified she never consented. Patty testified Usha knew about it. The Court need not decide who to believe because it is not material to the outcome of this matter.

6

distributions from Hospitality and some repayments in connection with the loans she made to Danny. The relationship between the siblings was still cordial during that time.

B. Financial Troubles and Transgressions by Management

Around 2007, Hospitality and Foods began experiencing financial trouble. The local health inspector threatened to close the Long Johns Silvers after it failed a health inspection in January 2007. Patty began working over twelve hours per day, seven days a week to ensure the restaurant remained open. She worked those hours for about four to six months during 2007. Despite Patty's efforts, the Long John Silvers - and therefore Foods - was losing money at a rapid rate.

Hospitality's revenues also began to decline in 2007, for two reasons. First, a front desk clerk was murdered at the Microtel Inn on September 18, 2007. The murder was publicized in the local newspapers. Twelve employees quit afterward, and Patty and Danny performed nearly all of the duties at the Microtel Inn including laundry, maintenance, housekeeping, etc. Danny had to stay at the hotel at night because the night auditor was too afraid to work alone. Second, room rents and occupancy declined because two new hotels were constructed near the same freeway exit in Tucumcari where the Microtel Inn was located. The Microtel Inn was previously the only hotel near that exit with a pool, exercise room, and hot breakfast, but the new hotels also offered those amenities. Travelers began staying at the newer, nicer hotels rather than at the Microtel Inn.

By 2008, several creditors of Foods began collection efforts against Foods and against Hospitality as a guarantor of Foods' loans. At least in part to protect assets from creditors, Patty and Danny thereafter engaged in various inappropriate business practices, including, among other things, depositing hotel revenues into their personal bank accounts, causing Hospitality to

7

pay the expenses of other entities, and unilaterally increasing their salaries. Patty and Danny engaged in some of these practices, albeit to a lesser degree, before Hospitality experienced financial trouble.

At trial, Usha and H.K. presented expert testimony along with an expert report detailing the amount of losses they sustained as a result of the inappropriate business practices. The report classified as "fraud" any transaction where Hospitality appeared to pay the expenses of another entity and any instance where cash belonging to Hospitality was not readily accounted for. In reality, based on information unavailable to the expert when he issued his report, these transactions should have been designated as suspect transactions, not fraud. When he issued his report, the expert did not have available to him Patty or Danny's deposition testimony or various relevant documents accounting for many of the transactions. Although he conceded at trial that he needed to make certain adjustments to the expert report based on new information, he did not identify many of the necessary adjustments in his testimony, nor did he amend the expert report after hearing all of the testimony or reviewing additional documents. In any event, any deficiencies in the expert report were not fatal to Usha and H.K.'s claim. As discussed below, the Court need not rely on the expert report to make detailed findings about amounts of missing cash, overstated operating costs, or excessive salaries because any misappropriation stemming from these transactions forms the basis for a derivative claim of Hospitality. As a member of Hospitality, Usha does not have a direct claim based on these occurrences, and she waived all derivative claims.[5]

---

[5] In closing argument, Usha by counsel argued that all of her claims are direct claims and none are derivative claims. In response to the Court asking Usha's counsel to confirm that Usha no longer asserts derivative claims, counsel answered "correct." As discussed below, Usha's counsel correctly believed that Usha would not benefit financially from any derivative recovery.

The business practices of which Usha and H.K. complain, including the three practices described above, are as follows:

1.  *Missing Cash*

Prior to 2008, Patty and Danny deposited most of the Microtel Inn's cash receipts into Hospitality's account at Wells Fargo. That year, they began depositing much of that cash into their personal bank account. Patty and Danny deposited into their personal account at least 70% of the cash receipts generated by the Microtel Inn for the years 2008, 2009, 2010, and 2011. They did so to prevent creditors of Foods, whose loans Hospitality had guaranteed, from collecting the money. Once Patty and Danny deposited the cash receipts in their personal account, the money was commingled with their personal funds.

In 2009, Patty and Danny started putting cash receipts in the Microtel Inn's safe to shield the cash from creditors. Patty moved the cash to a safe in Albuquerque when a receiver was appointed for the Microtel Inn. By October 2011, Patty and Danny had about $84,236.85 in cash in the safe. It is unclear from the evidence what happened to those funds.[6]

Patty and Danny also reduced the amount of Hospitality's available cash by cashing checks for employees of the Microtel Inn. Hospitality issued a paycheck to most employees every two weeks for hours worked, up to 80 hours per pay period. If an employee worked more than 80 hours in a two-week pay period, Hospitality paid overtime wages in cash. Some employees did not have checking accounts. In those cases, the employee endorsed his or her paychecks to Patty and Danny, who deposited it in their (Patty and Danny's) personal bank account. Patty and Danny then paid the employee cash from the front desk at the Microtel Inn. This practice caused Hospitality to pay the same wages twice - once when the paycheck was

---

[6] In his brief and in closing argument, counsel for Patty and Danny stated the money was paid to HSBC - the bank that foreclosed on the Microtel Inn. However, the evidence before the Court does not conclusively establish what happened to the money after it went into the safe.

deposited in Patty and Danny's personal account, and again when the employee received a cash payment from the front desk.

Patty accounted for repayment of a substantial portion of the cash diverted to her personal bank account. She essentially used her own funds and Hospitality's cash as a communal fund from which she made payments benefitting herself and Danny personally, Hospitality, Foods, and Usha. She and Danny paid various of Hospitality's operating expenses from their personal account and purchased supplies for Hospitality and Foods using their personal credit cards. They also used funds in their personal account in ways that benefitted Usha, such as by subsidizing the Long Johns Silvers owned by Foods.

Usha and H.K. assert Patty and Danny fraudulently misappropriated at least $300,000 in cash from the Microtel Inn. This amount is substantially overstated. The Court finds that to the extent Patty accounted for the missing cash, Usha was not harmed. To the extent Patty and Danny failed to account for a portion of the missing cash or did not use the cash for Hospitality's benefit, Hospitality would have a claim against Patty and Danny. It is not necessary to determine the exact amount of misappropriated cash because, as discussed below, Usha and H.K. cannot maintain a direct claim for this loss.

### 2. Expenses of Other Entities

Between 2003 and 2011, Patty and Danny used Hospitality's bank account to make payments to Sam's Club, Walmart, Sprint, and various equipment and food suppliers, including Shamrock Foods. They also used Hospitality funds to pay their personal credit card bills. At first blush, such expenses appear to be unrelated to Hospitality. In reality, some of those payments were for Patty and Danny's personal expenses, but most of them benefitted Hospitality. A few of the payments were made for the benefit of Foods or Lodging.

As with the missing cash, Patty accounted for most of the suspect expense payments. Hospitality made many of the payments to grocers and warehouse clubs such as Walmart and Sam's Club to purchase supplies for the Microtel Inn. Further, because Hospitality did not have a credit card, Patty and Danny often used their personal credit cards to pay Hospitality's expenses. Patty would then cause Hospitality to pay her and Danny's personal credit card bills. Hospitality paid Patty and Danny's cellular phone bills and transportation expenses, which Patty and Danny viewed as business expenses.

One of the main points in contention during trial, at least with respect to Hospitality's operating expenses, are the payments Hospitality made to Shamrock Foods after 2009. New Mexico Hotel Properties, LLC, owned by Patty and Danny, leased an Econolodge in Albuquerque in 2009, and Usha had no interest in that venture. After Shamrock Foods refused to sell supplies to Hospitality in 2009 following a payment dispute, Patty and Danny caused the Econolodge to purchase supplies from Shamrock Foods for Hospitality's benefit. Shamrock Foods delivered the supplies to the Econolodge in Albuquerque. Danny would then deliver such supplies to the Microtel Inn in Tucumcari. Based on this explanation, Patty accounted for nearly all of the suspect payments Hospitality made to Shamrock Foods. However, in a few instances, Hospitality paid for Shamrock-supplied items used at the Econolodge.

Usha and H.K. assert Patty and Danny fraudulently overstated Hospitality's operating expenses by at least $300,000. This amount is also substantially overstated. The Court finds that to the extent Patty accounted for Hospitality's payment of suspect operating expenses, Usha was not harmed. To the extent Patty and Danny failed to account for Hospitality's payment of certain expenses or used Hospitality's funds for the benefit of other entities, the Court need not quantify

the exact amount of the loss. As discussed below, Usha and H.K. cannot maintain a direct claim for this loss.

### 3. *Increased Salaries*

In 2007, Patty and Danny increased their salary from a combined $5,000 to a combined $10,500 ($3,000 for Patty and $7,500 for Danny).[7] Usha and H.K. did not consent to Hospitality increasing Patty and Danny's salaries, nor were they aware of it. Patty and Danny felt entitled to more compensation because they worked very long hours in the wake of the health inspection at the Long Johns Silvers and the murder at the Microtel Inn. Patty and Danny collected their salaries from Hospitality regardless of whether they performed work for Hospitality or for Foods.

The testimony varied a great deal regarding the amount of compensation Patty and Danny were receiving at any given time after 2007. For example, it is not entirely clear whether Patty continued to collect a $3,000 salary after 2010. It is also not entirely clear when Danny stopped receiving $7,500 per month. The Court finds Patty and Danny collected at least $7,500 per month between 2007 and 2010, and they likely collected that amount until 2012. As with the missing cash and operating expenses, the Court need not quantify the amount of excess compensation Patty and Danny collected from Hospitality because Usha and H.K. cannot maintain a direct claim for that loss.

### 4. *Loans from Hospitality*

Between about 2004 and 2009, Patty and Danny obtained a series of loans from Hospitality. Hospitality's tax returns for the tax years 2009 and 2010 reflect loans to Danny in the total amount of about $317,000. The amount listed on the tax returns may be incorrect, so

---

[7] The testimony conflicted as to when the increase to $7,500 occurred. At one point Patty testified Danny increased his salary to $7,500 in 2007, and at another point she stated the increase occurred after 2010. Based on all facts and circumstances, and on Patty's explanation of why the salaries increased in 2007 (*i.e.*, they worked more hours that year), the Court finds the increase occurred in 2007.

12

the exact amount of the loans is unclear. Based on the testimony, the Court finds Patty and Danny obtained loans from Hospitality in at the least the following amounts: (1) $35,000 in 2005; (2) $65,000 in 2008; and (3) $73,000 in 2009. Patty and Danny also obtained loans from Hospitality as early as 2004, but the exact amount of those loans is unclear. As of May 2010, Patty and Danny owed Hospitality at least $80,000 in connection with the loans.

Hospitality also loaned at least $381,000 to Lodging to purchase raw land and to pay for commissioned architectural plans for the Sleep Inn. Hospitality obtained most of those funds by refinancing the Microtel Inn in May 2006. Usha still owned 50% of Lodging at that time. A series of checks from Lodging to Hospitality show that Lodging repaid Hospitality a total of at least $63,000 in 2006 and 2007.

The Court finds that Patty and Danny had no fraudulent intent at the time they obtained loans to them personally from Hospitality. Patty and Danny initially intended to repay the loans, including the loans they obtained in 2004 and 2005. Such loans were not distributions in disguise, as Usha and H.K. assert. Patty and Danny made payments on the loans to Hospitality and, in some cases, to Usha directly, as evidenced in part by various checks from them to Hospitality. Such loans were listed on Hospitality's tax returns. Patty and Danny used a substantial portion of the loan proceeds to fund Foods, owned 50% by Danny and 50% by Usha, which was struggling financially. Further, in 2005 Danny allowed Usha to obtain an additional 30% interest in Foods in an attempt to repay some of the earlier loans Hospitality made to Patty and Danny. Contributing a portion of the loan proceeds to Foods, and attempting to repay a portion of the loans through transferring membership interests to Usha, may have had the effect of converting some of the loans to distributions, but Usha benefitted from such distributions.

Patty and Danny also lacked fraudulent intent when they caused Hospitality to make loans to Lodging. The evidence demonstrates that the loans were made when Usha owned 50% of Lodging. To the extent the loans constitute distributions, such distributions equally benefitted Usha and Danny. Further, and more importantly, the Court finds that Usha and H.K. knew about and acquiesced in the loans from Hospitality to Lodging.

### 5. *The Totaled Truck*

In early 2010, Danny got into a car accident while driving a truck purchased by Hospitality. Hospitality obtained the truck by trading in a different vehicle it previously purchased from Danny. The title of the truck listed Hospitality and Patty as owners. Hospitality's insurer determined the accident caused a total loss of the truck (*i.e.* the truck was totaled). On March 25, 2010, the insurer issued a settlement check in the amount of $6,116.67, which was jointly payable to Hospitality and Patty. Patty deposited the check into the bank account associated with the Econolodge, partly to protect the money from Hospitality's creditors, and partly because she viewed the truck as her and Danny's property. Later, she used the insurance proceeds to purchase a new truck for $11,000, which was titled in the name of Danny and their son. The insurance proceeds covered a portion of the cost of the new truck. Their son traded in his vehicle to cover the remaining cost. To the extent Patty misappropriated the insurance proceeds, Hospitality, not Usha, was damaged.

### 6. *Manipulated Revenue Amounts*

In 2009, Wyndham Hotels ("Wyndham") purchased the Microtel Inn franchise. Wyndham thereafter required the Microtel Inn franchisees to perform certain upgrades. For the Microtel Inn located in Tucumcari, these upgrades would cost about $120,000. Hospitality could not afford to perform the upgrades. If the Microtel Inn occupancy rate dropped below 49% for a

specified period, Hospitality could terminate the franchise agreement without liability. Patty and Danny were interested to know how low Hospitality's revenues would be if they artificially lowered the Microtel Inn's occupancy rate to 49%. Patty created pro forma Daily Reports and/or Monthly Reports to see how much less revenue was required to achieve the lowered occupancy.

Patty ultimately decided not to artificially lower the Microtel Inn's occupancy rate. However, she inadvertently included the pro forma reports in the package of documents she submitted to Hospitality's accountant, who input the incorrect numbers into Hospitality's 2009 tax returns. Patty later discovered the error and directed the accountant to amend those tax returns. Usha and H.K. were not defrauded or otherwise harmed by the creation or use of the pro forma reports.

### 7. *The Line of Credit*

Around 2003, Usha obtained a line a credit from Wells Fargo in the amount of $29,000. Wells Fargo issued the line of credit jointly in the name of Usha, individually, and Hospitality. Usha obtained the line of credit as a source of payment of necessary expenses of Hospitality. Patty and/or Danny drew on the entire $29,000 in 2007 to pay their personal expenses. They were able to access the line of credit from Wells Fargo because Danny was the majority owner of Hospitality. Usha was not aware of, and did not consent to, the draws on the line of credit for personal expenses.

Patty testified she and Danny repaid Usha the $29,000 by a series of checks written between December 2007 and November 2009. *See* Exhibit 36-7 through 36-14. This testimony was not credible. There is no contemporaneous accounting record indicating that the checks in question related to the line of credit. Only two of the checks have notations in the memo line, and these notations contradict Patty's testimony. Check number 3846 includes the notation

15

"FOR: from credit card," and check number 1264 includes the notations "FOR: Dipak," which is a version of Danny's name. For these reasons, the Court finds Usha's line of credit was entrusted to Patty and Danny, who fraudulently misappropriated $29,000 of funds therefrom. Such funds were never repaid.

8.    *2010 Distribution to Usha*

Schedule K-1 attached to Hospitality's tax returns shows, and the Court finds, that Hospitality made a distribution to Usha in 2010 in the amount of $6,946. Based on her testimony, which the Court finds credible on this point, Usha did not receive that distribution. The only other individuals who could have obtained Usha's 2010 distribution were Patty and Danny. The Court finds that: (1) Usha's 2010 distribution from Hospitality in the amount of $6,946 was entrusted to Patty and Danny; and (2) Usha never received such distribution because Patty and Danny fraudulently misappropriated those funds for their own benefit.

9.    *Unpaid Taxes*

Between about 2003 and 2009, Patty and Danny failed to pay a portion of lodging and gross receipts taxes on behalf of Hospitality. In 2010 and 2011, they stopped paying those taxes altogether. Thereafter, the State of New Mexico Taxation and Revenue Department filed a series of tax liens against Hospitality in the amount of about $220,000. The City of Tucumcari also filed two liens in the amount of about $27,000 in 2008 and 2009, respectively. There is no evidence that Hospitality ever paid its past due taxes.

10.    *The Check From the Holiday Inn Express*

Holiday Inn Express issued a check payable to Dipak Patel (*i.e.* Danny) in the amount of $20,000 on February 4, 2008. Patty or Danny deposited it into their personal account two days later. They paid $14,000 of those funds into Hospitality and kept the remaining $6,000 for

themselves. Usha and H.K. assert the check was meant for Hospitality and that Danny intercepted it for his personal use. The evidence does not support that assertion. Based on the testimony and exhibits, it is unclear what the relationship was among the Holiday Inn Express, Hospitality, and Danny. There is no credible evidence that the Holiday Inn Express ever committed to loan or otherwise pay money directly to Hospitality. The purpose of the check is also unclear. Patty merely testified that she took a loan from the Holiday Inn Express, she or Danny paid a portion of the proceeds to Hospitality, and that she repaid about half of the loan. The Court finds that no fraudulent conduct occurred in connection with the check from the Holiday Inn Express.

11. *Loan to Daxa Patel*

In January 2006, Patty caused Hospitality to loan $5,000 to Daxa Patel. Daxa is Usha and Danny's sister. Patty called Usha to obtain her blessing for the loan, but Usha was unavailable. Usha therefore did not consent to Hospitality making the loan, and it is unclear whether she was aware of it until after she filed the adversary proceeding. There is no evidence that Daxa repaid the loan.

C. The Foreclosure Action and the End of the Roshan Entities

By 2009, the Roshan Entities were in serious financial trouble. Lodging was essentially defunct. Foods was hemorrhaging money, and around May 2008, Usha and Danny transferred operations of the Long Johns Silvers to Patty's brother Mahendra Patel. Usha and Danny still owned Foods, but they ceased any involvement in the company after that occurred. Mahendra added his name to the Long Johns Silvers franchise agreement and guaranteed Foods' loans.

Patty and Danny moved to Albuquerque in May of 2009 to run the Econolodge. Patty kept the books and records of the Microtel Inn from Albuquerque, and Danny made frequent

17

trips to Tucumcari to make deliveries and oversee operations. Patty and Danny's move to Albuquerque caused friction between the Patel families, as Usha and H.K. believed Patty and Danny were shirking their management responsibilities.

In 2009, Foods defaulted on its mortgage with Tucumcari Federal. On February 5, 2010, Tucumcari Federal commenced a foreclosure action against Foods in New Mexico's Tenth Judicial District Court (the "State Court"). About four months later, the State Court entered a monetary judgment in favor of Tucumcari Federal and against Foods, Hospitality, Danny, Usha, and H.K.[8] in the amount of $1,042,228.36, plus interest at a rate of 18% until the judgment was paid (the "2010 Judgment"). The 2010 Judgment also entitled Tucumcari Federal to foreclose on certain real property owned by Foods.

Hospitality defaulted on its mortgage with Sienna Capital in December 2009. Thereafter, it made no further mortgage payments. Sienna Capital or its assignee commenced a foreclosure proceeding against Hospitality on August 16, 2010.

By that point, Usha and H.K. were extremely upset with Patty and Danny's operation of Hospitality. In September 2010, two relatives met with Patty and Danny on H.K.'s behalf to mediate the family dispute. Patty provided the relatives with various accounting records and showed them the cash stored in Econolodge's safe. H.K. was not satisfied with their accounting. Patty and Danny continued to operate Hospitality during the pendency of the Hospitality foreclosure proceeding without communicating with Usha or H.K.

On July 18, 2012, the State Court entered a foreclosure judgment in favor of HSBC Bank USA, National Association - presumably Sienna Capital's assignee - and against Hospitality and "all unknown persons who may claim a lien, interest, or title adverse to the Plaintiff" in the

---

[8] Patty was not a named judgment debtor.

amount of $2,497,103.54, plus a daily fee of $511.86 until the judgment was paid (the "2012 Judgment").

The amount of the deficiency, if any, in connection with the 2012 Judgment for $2,497,103.54 is unclear. There is no evidence regarding the amount of HSBC Bank USA, National Association's credit bid at the foreclosure sale, assuming it made a credit bid. The deficiency in connection with Tucumcari Federal's 2010 Judgment was substantial.[9] The deficiency on the 2010 Judgment is still owed. None of the judgment debtors were in a position to pay it. Hospitality also owes taxing authorities at least $270,000, and there is no evidence any past-due taxes have been paid. The total amount of the 2010 Judgment, the 2012 Judgment, and the unpaid taxes is about $3,809,000. Hospitality's tax returns, along with Patty's testimony regarding available cash, show that Hospitality owned about $1,597,000 worth of assets, consisting of: (1) a hotel worth about $1,200,000; (2) land worth about $313,000; and (3) about $84,000 in cash.[10] The hotel was likely worth substantially less than $1,200,000 in light of the declining condition of the Microtel Inn and the addition of two newer, nicer hotels in the area.

Based on the amounts of the judgments and tax liens, the evidence regarding Hospitality's assets, and the evidence regarding Hospitality's declining financial condition and inability to pay its debts between 2009 and 2012, the Court finds that Hospitality is insolvent by more than $400,000. That amount represents Usha's total claim for damages in her capacity as a member of Hospitality, minus attorney's fees. As discussed below, Usha and H.K. are not entitled to reimbursement of their attorney's fees.

---

[9] The exact amount of the deficiency is not entirely clear. Hospitality's accountant, who also performed work for Tucumcari Federal, testified that the deficiency was substantial. When asked "how much was the deficiency on the Foods loan after the property was foreclosed?" Patty answered "the judgment was $1,086,000 or $1,046,000."

[10] In calculating the amount of Hospitality's assets, the Court discounted any assets listed on the tax return that, based on the testimony, were worthless. For example, based on the evidence it is clear that the note from Danny to Hospitality was worthless by 2012.

19

Hospitality is no longer an operating entity. Its business failed due to a number of factors including increased competition and the murder that occurred at the Microtel Inn. Based on the evidence presented at trial, Usha and H.K. have not established Hospitality's business failed because of Patty or Danny's conduct, nor have they proved that Patty or Danny caused them to lose the amount of their principal investment.

Patty and Danny filed a voluntary petition under Chapter 7 of the Bankruptcy Code on May 24, 2010. Usha and H.K. filed their voluntary Chapter 7 petition about seven weeks later. Usha and H.K. received a discharge on September 28, 2010. Based on a number of factors, including the fact that Foods was failing and Usha and H.K. had guaranteed Foods' loans, the Court finds that Patty and Danny's conduct did not cause Usha and H.K. to seek bankruptcy relief.

Usha and Danny's relationship never recovered.

## DISCUSSION

Usha and H.K. seek a nondischargeable judgment against Patty and Danny in the amount of $581,473.73. Usha and H.K. assert claims under 11 U.S.C. § 523(a)(2)(A) (fraud) and 523(a)(4) (embezzlement and defalcation while acting in a fiduciary capacity) based on the following categories of alleged misconduct: Category 1: misappropriation of expenses (*i.e.* causing Hospitality to pay Patty and Danny's personal expenses and expenses of other entities); Category 2: misappropriation of cash; Category 3: misappropriation of funds from Hospitality's bank account, not including salary or wages (which Patty and Danny assert were loans); Category 4: misappropriation of insurance proceeds for the totaled truck; Category 5: misappropriation of loan proceeds from the Holiday Inn; Category 6: misappropriation of funds from the line of credit; Category 7: misappropriation of Usha's 2010 distribution; and Category

8: Hospitality's unauthorized loan to Daxa Patel. Usha and H.K. also seek attorney's fees, costs, and sanctions for perjury.

Usha and H.K. waived all derivative claims asserted in this adversary proceeding on behalf of Hospitality. Apparently they believed, correctly, that in light of the requirement that a limited liability company distribute assets to creditors before making distributions to members, and in light of Hospitality's large amount of debt, they would not receive any personal, financial benefit if Hospitality recovered on a derivative claim. Usha and H.K. therefore seek to assert all claims described above as direct claims only.

I.      Whether Usha and H.K. May Assert Direct Claims

Before turning to the merits of Usha and H.K.'s claims under §§ 523(a), the Court must decide whether they may assert all or some of their claims as direct rather than derivative claims. Whether a member of a company may assert a direct claim against a fellow member is a question of standing. *See Clark v. Sims,* 147 N.M. 252, 253, 219 P.3d 20, 23 (Ct.App. 2009) (analyzing whether a shareholder has individual standing to bring a direct claim); *Rael v. Page,* 147 N.M. 306, 311, 222 P.3d 678, 683 (Ct.App. 2009) (concluding that the plaintiff had standing to bring a direct action against a corporate officer).

Patty and Danny contend Usha and H.K. cannot assert any of the claims at issue because, to the extent they are responsible for any wrongdoing, Hospitality - not Usha - was damaged. Usha and H.K. disagree, for two reasons. They assert the claims are direct under New Mexico law, or alternatively, the Court should relax the traditional direct-derivative distinction because of the closely held nature of Hospitality.

21

A.     *Whether the LLC Act Entitles Usha and H.K. to Assert a Direct Claim*

First, Usha and H.K. argue they have standing to assert direct claims based on Patty and Danny's misappropriation from Hospitality because New Mexico's Limited Liability Company Act, N.M.S.A. 1978 § 53-19-1, *et. seq.* ("NMLLCA"), does not require such claims to be asserted as derivative actions.  Usha and H.K. further argue that the NMLLCA's provision protecting managing members from liability except in cases of gross negligence or willful misconduct provides a basis for a direct action.

Usha and H.K. are correct that the NMLLCA permits, but does not mandate, derivative suits.  Section 53-19-58 of the NMLLCA provides, in relevant part:

> Except as otherwise provided in the articles of organization or an operating agreement, a suit on behalf of the limited liability company may be brought in the name of the limited liability company by:
>
> > A. any member of the limited liability company who is authorized to sue by the affirmative vote of members having a majority of the voting power of all members whose interests are not adverse to the interests of the limited liability company, whether or not the articles of organization or an operating agreement vests management of the limited liability company in one or more managers[.]

N.M.S.A. 1978 § 53-19-58(A).  However, this section does not address whether a claim is direct or derivative, nor does it address the circumstances under which members can assert a direct claim.  Instead, it merely confers upon members the right to pursue an action in the name of the LLC if certain conditions are met.

Section 53-19-16(B) of the NMLLCA, which addresses member liability, is similarly silent on the direct versus derivative question.  It provides that a managing member is generally not liable "to the limited liability company or to the other members solely by reason of his act or omission on behalf of the limited liability company in his capacity as" a managing member "unless such act or omission constitutes gross negligence or willful misconduct."  N.M.S.A.

22

1978 § 53-19-16(B).  That section does not change a claim's direct or derivative nature.  It simply limits liability for ordinary negligence; regardless of whether a claim is direct or derivative, if the claim is based on mismanagement, Section 53-19-16 establishes a heightened standard to prevail.

The fact that the NMLLCA does not address whether a claim is direct or derivative does not mean the legislature intended to dispense with long-standing common law principles governing shareholder/member derivative actions.  Section 53-19-65 provides that unless displaced by particular provisions of the NMLLCA, "the principles of law and equity supplement that act, including such principles applicable to corporations and their owners."  N.M.S.A. 1978 § 53-19-65.  The Court will therefore apply principles of common law governing corporations - and in particular New Mexico law - to determine whether Usha and H.K.'s claims are direct or derivative.  *See* 12B Fletcher Cyc. Corp. § 5911 ("State law determines whether a shareholder may maintain a direct, nonderivative action."); *Combs v. PriceWaterhouse Coopers LLP*, 382 F.3d 1196, 1200 (10th Cir. 2004) (analyzing whether the plaintiff alleged a derivative claim under state law).

      B.     *Whether Common Law Entitles Usha and H.K. to Assert Direct Claims*

Under New Mexico law, the general rule is that shareholders have standing to assert derivative, but not direct, claims to "sue … for injuries to his or her corporation."  *Marchman v. NCNB Texas Nat. Bank,* 120 N.M. 74, 81, 898 P.2d 709, 717 (1995).   "[W]hen the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his [or her] corporate shares[,] … it has been consistently held that the primary wrong is to the corporate body[.]"  *Id.* (quoting *Kauffman v. Dreyfus Fund, Inc*., 434 F.2d 727, 732 (3d Cir.1970)).  "Thus, although the stockholders of a

23

corporation suffer when the corporation incurs a loss," they "should look to the recovery of the directly injured party, not the wrongdoer for relief." *Id.* (internal quotations omitted). *See also Clark v. Sims,* 147 N.M. 252, 254-255, 219 P.3d 20, 22-23 (Ct.App. 2009) ("*Marchman* applied the traditional rule and held that the shareholder in that case lacked individual standing to bring a direct action against third persons for damages resulting from an injury to the corporation, even though the shareholder was indirectly injured.").

Exceptions to the general rule exist "where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder," and "where the shareholder suffered an injury separate and distinct from that suffered by other shareholders." *Marchman,* 120 N.M. at 81-82, 898 P.2d at 716-717 (quoting 12B Fletcher Cyc. Corp. § 5911). In such cases, the shareholder or member has standing to assert a direct claim against the wrongdoer. More recently, the New Mexico Court of Appeals clarified the direct versus derivative analysis using a two-part test "based on the following questions: (1) '[w]ho suffered the alleged harm - the corporation or the suing stockholder[s] individually - and (2) who would receive the benefit of any recovery or ... remedy?'" *Rael v. Page,* 147 N.M. 306, 311, 222 P.3d 678, 683 (Ct.App. 2009) (quoting *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031, 1035 (Del.2004)). In other words, "a court should look to the nature of the wrong and to whom the relief should go." *Id.*[11]

---

[11] *Healthsource, Inc. v. X-Ray Associates of New Mexico,* 138 N.M. 70, 78 116 P.3d 861, 869 (Ct.App. 2005) articulated a more complex test with essentially the same elements as follows:

> [T]he framework in which to analyze Plaintiff's claims against Defendants is to first ask whether Plaintiff's injury is an indirect harm arising primarily from an injury inflicted upon Lovelace by Defendants. We then proceed to analyze whether Plaintiff's damages are a diminution in the value of Lovelace's stock resulting from the impairment of corporate assets. If the first two steps in the process are answered in the affirmative, then Plaintiff lacks standing to sue unless we conclude that Defendants had a special duty to Plaintiff or Plaintiff suffered an injury separate and distinct from other shareholders.

24

Applying these principles, the Court concludes that Usha's claims for embezzlement and misappropriation of corporate assets are derivative, not direct claims. With such claims, the company suffers the direct harm; money is fraudulently misappropriated (or embezzled) from the company itself, not from its members. If the misappropriated funds were recovered, the company - not the individual members - would be entitled to collect the money. Further, when a manager misappropriates funds from a company, all members (even the wrongdoers) experience a diminution in value of their membership interest. The innocent members therefore do not suffer a separate and distinct injury from other members that would allow them to pursue direct claims for misappropriation or embezzlement.

The vast majority of authority supports this conclusion. *See, e.g.,* 12B Fletcher Cyc. Corp. § 5924 (enumerating mismanagement, misappropriation, and corporate waste as derivative causes of action); *Petty v. Bank of New Mexico Holding Co.,* 109 N.M. 524, 527, 787 P.2d 443, 446 (1990) ("The courts will protect minority stockholders against fraud or a breach of trust by officers or directors…. [M]inority stockholders can obtain relief against acts of mismanagement [and] abuse of discretion … through a derivative as distinguished from an individual action.") (quoting 19 Am.Jur.2d Corporations § 2262, at 161 (1986)); *In re Deerman*, 482 B.R. 344, 375 (Bankr.D.N.M. 2012) ("[E]mbezzlement … is a derivative claim"); *In re Spivey*, 440 B.R. 539, 545 (Bankr.W.D.Ark. 2010) (finding that a claim for defalcation by a debtor of a limited liability company's property belonged to the limited liability company since the duty and the debt was owed to the company; consequently, the member's was derivative); *In re Whittle*, 449 B.R. 427, 430 (Bankr.M.D.Fla. 2011) (finding that plaintiffs could not assert a direct claim for embezzlement against a member of a limited liability company because any damage would be inflicted on the limited liability company, not the plaintiffs individually*); In re Liebl*, 434 B.R.

25

529, 541 (Bankr.N.D.Ill. 2010) (concluding that the plaintiff could not recover individually on a claim based on the debtor's embezzlement of funds from the limited liability company because plaintiff could not demonstrate that the misappropriated property belonged to him personally).

For embezzlement and misappropriation of corporate assets, Usha claims damages equal to 20% of the amount of embezzled or misappropriated assets. The 80% discount is based on Usha owning only 20% of Hospitality. Usha's damages calculation further supports the Court's conclusion that her claims are not direct claims.

Here, the following categories of misconduct form the basis of a claim for misappropriation or embezzlement: Category 1 (misappropriated expenses, which involves Patty and Danny causing Hospitality to pay their personal expenses); Category 2 (misappropriation of cash from Hospitality); Category 3 (misappropriation of funds directly from Hospitality's bank account); Category 4 (misappropriation of insurance proceeds belonging to Hospitality for the totaled truck); Category 5 (misappropriation of loan proceeds from the Holiday Inn which allegedly belonged to Hospitality);[12] and Category 8 (Hospitality's unauthorized loan to Daxa Patel). Under traditional standards applicable to shareholder derivative suits, Usha lacks standing to assert such claims directly against Patty and Danny.[13]

The remaining categories of conduct form the basis for direct claims. Usha has standing to assert a claim based on Category 6, which involves the misappropriation of funds from the line of credit, because she was a joint owner of, and obligor under, the line of credit with Hospitality. The claim based on Category 7, which involves the misappropriation of Usha's

---

[12] As the Court's findings indicate, this claim also fails because there is no evidence such proceeds ever belonged to Usha, H.K., or Hospitality.
[13] The Court need not address Usha and H.K.'s argument that Categories 1-5 also form the basis for direct claims because certain withdrawals Patty and Danny categorized as loans were actually disguised distributions to Danny, of which Usha was denied her share. The Court found that Patty and Danny initially intended to repay the loans they obtained from Hospitality and that the loans were not distributions in disguise, as Usha and H.K. assert.

2010 distribution, is a direct claim because once Hospitality made the distribution, the funds belonged to Usha individually. Finally, the claims for attorney's fees, costs, and sanctions for perjury are direct because those claims arose in connection with this litigation, which Usha and H.K. pursued individually.

C.       *Whether the Court Should Relax the Traditional Standard Governing Derivative Suits*

Alternatively, Usha and H.K. argue that even if certain of their claims ordinarily would be derivative, the Court should relax the traditional distinction between derivative and direct claims under the circumstances of this case. According to Usha and H.K., the policy reasons favoring derivative actions are not applicable to closely held companies, particularly where the only members are the litigants.

New Mexico courts have recognized that, under certain circumstances, "[t]he general rule requiring derivative suits should not be stringently enforced when the corporation in question is a closely held one." *Clark v. Sims*, 147 N.M. 252, 256, 219 P.3d 20, 24 (Ct.App. 2009). As one treatise observed, "[t]he derivative/direct distinction makes little sense when the only interested parties are two individuals or sets of shareholders, one who is in control and the other who is not. In this context, the debate over derivative status can become purely technical." *Id.* (quoting 2 F. Hodge O'Neal & Robert B. Thompson, *O'Neal and Thompson's Close Corporations & LLCs: Law & Practice* § 9.22, at 138–39 (3d ed. 2008)).

In *Clark,* the court found that "relaxing the traditional distinction between derivative and direct suits makes sense … in the context of a close corporation" because the reasons underlying the traditional rule did not apply. Such reasons include:

> (1) it prevents a multiplicity of lawsuits by shareholders; (2) it protects corporate creditors by putting the proceeds of the recovery back in the corporation; (3) it protects the interests of all shareholders by increasing the value of their shares, instead of allowing a recovery by one shareholder to prejudice the rights of others not a party to the

suit; and (4) it adequately compensates the injured shareholder by increasing the value of his shares.

*Id.* at 257, 25 (quoting 12B Fletcher Cyc. Corp. § 5911.50).[14]  The court went on to note that "[t]here is no practical need to insist on derivative suits when there is little likelihood of a multiplicity of suits or harm to creditors…[.]  Any recovery in a derivative suit would return funds to the control of the defendant, rather than to the injured party."  *Id.* at 257, 25.  The court ultimately concluded that the plaintiff there had standing to pursue a direct claim, in part because the applicable statutes of limitations on creditor claims had likely long since run.  *Id.*

Here, unlike in *Clark*, relaxing the traditional distinction between direct and derivative claims would materially prejudice third party creditors in violation of the distribution scheme of the NMLLCA.  Usha and H.K. seek damages on account of Usha's membership and equity interest in Hospitality.  Her damages calculation consists of the total amount of misappropriated funds, discounted by 80% to reflect her 20% interest in Hospitality.  In a section titled "Distribution of Assets," the NMLLCA provides that upon the winding up of a limited liability company, the assets of that company are to be distributed first to creditors (excluding members who are creditors by virtue of missing distributions) and, if remaining assets exist, to members. N.M.S.A. 1978 § 53-19-44.  This distribution scheme implements the fundamental principle of corporate law requiring creditors to be paid before shareholders during the windup of an enterprise.  *See* 16 Fletcher Cyc. Corp. § 7941 (noting that creditors are entitled to a preference over shareholders in the distribution of assets, such that "[s]hareholders are generally prohibited

---

[14] The American Law Institute provides similar reasons for relaxing the standard:

> In the case of a closely held corporation ..., the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

2 A.L.I., *Principles of Corporate Governance: Analysis and Recommendations* § 7.01(d) (1994).

… from receiving distributions if it would render the corporation unable to discharge its liabilities").[15]  If the Court allowed Usha to assert a direct claim based on injuries to Hospitality - which is no longer an operating entity - the Court would be allowing her to circumvent the statutory distribution scheme and obtain a distribution on account of her equity interest before creditor claims are paid.  It is therefore not appropriate to allow Usha and H.K. to pursue claims for misappropriation and embezzlement as direct claims against Patty and Danny based on the relaxed standard set forth in *Clark*.

The degree of insolvency can matter to whether the traditional direct versus derivative standard should be relaxed in the context of closely held corporations.  The result may be different if, for example, a member asserts both a derivative and direct claim against another member based on the same conduct, and after recovery on the derivative claim the company has sufficient assets to pay its creditors in full.  In that case, the member could recover sufficient funds on behalf of the LLC through a derivative action to pay creditors in full and assert the remainder of the claim directly against another member.  Once creditor claims are paid, the litigation between members of a closely held corporation would transform into the classic two-party dispute described by *Clark*.  Here, however, the Court has found that, even apart from the waiver of derivative claims, Usha and H.K. cannot recover an amount that would pay Hospitality's creditors in full because the degree of Hospitality's insolvency exceeds the amount of Usha and H.K.'s claims, exclusive of attorney's fees.  As discussed below, the Court has also found that Usha and H.K. do not have a valid claim for attorney's fees.

---

[15] *See also In re Terry Mfg. Co., Inc.* 2007 WL 274319, * 7 (Bankr. M.D.Ala. 2007) (rejecting plaintiffs' claim because it "runs contrary to the deep seated policy which holds that creditors of a defunct corporation are paid before shareholders"); *Matter of Munford, Inc.,* 97 F.3d 456, 459 (11th Cir. 1996) (noting that the Bankruptcy Code incorporates "the longstanding principle that creditors are to be paid before shareholders").

Based on the foregoing, the Court concludes Usha and H.K. lack standing to assert claims in Categories 1, 2, 3, 4, 5, and 8 because such claims are derivative in nature.[16]  The Court will separately analyze whether Usha and H.K. can prevail on their direct claims under § 523(a) stemming from <u>Category 6</u> (misappropriation of funds from the line of credit) and <u>Category 7</u> (misappropriation of Usha's 2010 distribution), as well as whether they are entitled to damages for attorney's fees, costs, or sanctions for perjury.

II.     <u>Nondischargeability Under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4)</u>

To the extent Usha and H.K. are permitted to assert direct claims, they argue such claims are nondischargeable under §§ 523(a)(2)(A) and/or 523(a)(4).  According to Usha and H.K., Patty and Danny procured the proceeds from the line of credit and Usha's 2010 distribution by fraud and embezzlement.  They also argue that Danny is liable under § 523(a)(4) because he breached his fiduciary duties to Usha in a gross and flagrant fashion.

*A.  Section 523(a)(4)*

The Court begins its inquiry with § 523(a)(4).  Section 523(a)(4) excepts from discharge debts arising from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  To prove the fraud or defalcation element of § 523(a)(4), the fiduciary relationship must be one arising from an express or technical trust.  *In re Regan,* 477 F.3d 1209, 1211 n. 1 (10th Cir. 2007) ("[A]n express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4).") (internal quotations omitted).  Further, "[t]he trust giving rise to the fiduciary relationship must be imposed prior to any wrongdoing; the debtor must have been a

---

[16] *See* Supra, pages 20-21 for a description of the different categories of claims.

'trustee' before the wrong and without reference to it." *In re Galvan,* 430 B.R. 685, 691 (Bankr.D.N.M. 2009).[17]

  The NMLLCA does not impose a trust relationship between members, nor do Usha and H.K. point to any other basis for a pre-existing express or technical trust in this case. To the extent they argue Patty and Danny were obligated to hold Hospitality's funds in trust after misappropriating them, the trust would have arisen after the wrongdoing. Even if such trust existed, it could not form the basis of a valid claim under § 523(a)(4).

  However, Usha and H.K. have proved their direct claims for embezzlement relating to the line of credit and the 2010 distribution. Embezzlement consists of "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Wallace*, 840 F.2d 762, 765 (10th Cir.1988). In other words, a creditor must show: (1) his or her property was entrusted to the debtor; (2) the debtor appropriated the property for a use other than the use for which it was entrusted; and (3) the circumstances indicate fraud. *In re Bucci*, 493 F.3d 635, 644 (6th Cir. 2007)). *See also In re Putvin*, 332 B.R. 619, 627 (10th Cir. BAP 2005) ("Under 523(a)(4) embezzlement will have occurred when there is a fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come, and it requires fraud in fact, involving moral turpitude, or intentional wrong, rather than implied or constructive fraud.") (internal quotations omitted).

---

[17] *See also Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, (1934) ("It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto."); *In re Bangerter*, 1992 WL 168852, * 1 (9th Cir. 1992) ("[T]he trust creating the fiduciary relationship must arise prior to the alleged wrongdoing."); *Eavenson v. Ramey,* 243 B.R. 160, 166 (N.D.Ga. 1999) (noting that for purposes of § 523(a)(4), the technical trust must "arise prior to and without regard to the breach of given fiduciary duties").

Case 10-01200-j   Doc 140   Filed 08/21/15   Entered 08/21/15 18:31:57 Page 31 of 36

Here, Usha entrusted her line of credit - which she jointly owned with Hospitality - to Patty and Danny to pay Hospitality's expenses. Patty and Danny then withdrew all of the funds from the line of credit ($29,000) and used the proceeds to pay personal expenses rather than Hospitality's operating expenses. The circumstances indicate fraud because Patty and Danny knew the line of credit was to be used for Hospitality's operating expenses, and they drew on it for personal expenses without Usha's knowledge or consent. Further, Patty asserted she repaid Usha or Hospitality, but the checks indicated the payments were for other purposes.

Usha also established Patty and Danny fraudulently appropriated her 2010 distribution from Hospitality, which totaled $6,946. The distribution was entrusted to Danny as the managing member of Hospitality. Patty and/or Danny prepared Hospitality's accounting records, distributed payments to members, and signed Hospitality's tax returns. Rather than transmitting the funds to Usha, or even alerting her to the fact that they caused Hospitality to make the distribution, Patty and Danny kept Usha's funds for personal use.

The Court concludes that Patty and Danny embezzled a total of $35,946 from Usha. That amount is therefore nondischargeable under § 523(a)(4). Having made such a determination, the Court need not address whether Usha and H.K.'s claims under § 523(a)(2)(A) in connection with the line of credit and the 2010 distribution give rise to nondischargeable debts.

III.    Damages

In additional to actual damages under § 523(a)(4), Usha and H.K. seek attorney's fees, costs, and sanctions for perjury. Patty and Danny contend such damages are inappropriate. They also argue that even if the Court finds liability under §§ 523(a)(2)(A) or 523(a)(4), Usha and H.K. suffered no actual damages because Usha and H.K. obtained a Chapter 7 discharge.

32

### A. Attorney's Fees and Costs

Usha and H.K. rely on *Cohen v. de la Cruz*, 523 U.S. 213 (1998) as support for their assertion that the attorney's fees and costs they incurred in this adversary proceeding are nondischargeable. *Cohen* held that for purposes of § 523(a)(2)(A), a debt obtained by fraud "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." Numerous courts have applied the reasoning of *Cohen* to other categories of nondischargeable debt. *See In re Musgrave,* 2011 WL 312883, *9 (10th Cir. BAP 2011) ("*Cohen* involved a § 523(a)(2) claim, [but] the Supreme Court's analysis of the text and structure of § 523(a) suggest its holding is not limited to § 523(a)(2).").[18]

Although *Cohen* permits courts to award attorney's fees and costs as a part of a nondischargeable judgment under § 523(a), it does create an entitlement to attorney's fees and costs merely because the underlying claim is nondischargeable. "As one bankruptcy court explained, 'it is clear that *Cohen* itself does not create an independent right to attorney's fees for the benefit of a party who prevails in a Section 523 dischargeability proceeding. Instead, it clarifies that attorney's fees supported by statute are included in the debt that may be determined to be non-dischargeable.'" *In re Schmank,* 2015 WL 4555582, *16 (Bankr.E.D.Tenn. 2015) (quoting *In re Atchison*, 255 B.R. 790, 793 (Bankr.M.D.Fla. 2000)). In other words, if a party has an independent right to recover attorney's fees or costs under applicable law in connection

---

[18] *See also In re Baker,* 2014 WL 948656, *3 (Bankr.D.N.M. 2014) ("Although *Cohen* dealt with nondischargeable debt under § 523(a)(2)(A), its holding likely applies to nondischargeable embezzlement debts as well."); *In re Suarez,* 400 B.R. 732, 738-39 (9th Cir. BAP 2009) (applying *Cohen* to § 523(a)(6) claims); *In re Karpinsky,* 328 B.R. 516, 528 (Bankr.E.D.Mich. 2005) (noting that "[a]lthough §§ 523(a)(4) & (a)(6) were not at issue in *Cohen*, the Supreme Court cited §§ 523(a)(4) & (a)(6) as clear examples of instances in which statutory damages, including attorney's fees, that exceed actual damages would be non-dischargeable"); *In re Whittington,* 530 B.R. 360, 407 (Bankr.W.D.Tex. 2014) (applying *Cohen's* "arising from" test in the context of § 523(a)(4)).

33

with a particular nondischargeable debt, the party is entitled to an award of such attorney's fees or costs as part of the non-dischargeable judgment under § 523(a).

Having determined *Cohen* does not automatically entitle Usha and H.K. to attorney's fees or costs, the Court must follow "the bedrock principle known as the American Rule." *Baker Botts L.L.P. v. ASARCO LLC*, 135 S.Ct. 2158, 2164 (2015).  Under that rule, "each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Id.*  Usha and H.K. have not pointed to, and the Court is not aware of, any contract or applicable law creating a right to an award of attorney's fees on the debt the Court has found to be nondischargeable.  Their claim to recover attorney's fees in connection with the nondischargeable judgment is therefore denied.  The Court will consider an award of costs if Usha and H.K. timely file a motion to tax costs.  *See* N.M. Local Rule 7054-1 (setting forth instructions regarding motions to tax costs, which must be filed within 14 days of entry of a final judgment or order).

*B.  Sanctions*

Usha and H.K. also seek sanctions in the amount of $50,000.  They assert Patty lied under oath at various times during trial.  The Court denies this request, for two reasons.  First, if the Court were to sanction Patty based on instances where the Court found her testimony not to be credible, it must also sanction Usha and H.K.  The Court found a portion of their testimony not to be credible as well.  Second, the trial was conducted in three parts over two years, and witnesses were asked to testify about events that occurred up to ten years earlier.  The Court, in its discretion, finds that to the extent Patty, Usha, and/or H.K. gave inaccurate testimony, such testimony does not rise to the level of sanctionable conduct.  *See Australian Gold, Inc. v.*

34

*Hatfield,* 436 F.3d 1228, 1243 (10th Cir 2006) (the decision whether to impose sanctions, and the choice of sanctions, are within the discretion of the trial court).

### C. *The Effect of Usha and H.K.'s Bankruptcy Discharge*

Finally, Patty and Danny assert that even if Usha and H.K. proved embezzlement, Usha and H.K. mitigated any damages by obtaining a Chapter 7 discharge. Mitigation is an affirmative defense upon which the defendant bears the burden of proof. *See* 5 Wright & Miller, *Federal Practice & Procedure* § 1271 (3d ed.) (listing mitigation as an affirmative defense). Patty and Danny's mitigation argument is not applicable to the misappropriated 2010 distribution; the bankruptcy discharge had no effect on that amount.

With respect to the line of credit, the Court agrees that if Usha discharged her obligation to repay the $29,000 debt arising from the line of credit, and if she suffered no consequential or incidental damages as a result of the misappropriation, she would not be entitled to a nondischargeable judgment in that amount. Here, however, Usha and H.K. filed their bankruptcy petition about three years after Patty and Danny wrongfully drew on the line of credit, and there is no evidence whether Usha repaid Wells Fargo prior to the petition date. Schedule F contained in Usha's bankruptcy petition shows three debts to Wells Fargo: (1) a debt to Wells Fargo, Business Direct Operations in the amount of $16,743; (2) a debt to Wells Fargo Business Direct in the amount of $55,371; and (3) a debt to Wells Fargo Financial, Leasing Customer Service in the amount of $9,254.[19] Based on the record, it is not clear whether Usha discharged the debt arising from the $29,000 line of credit. Patty and Danny therefore failed to prove their defense that Usha suffered no damages as a result of her Chapter 7 discharge.

---

[19] The Court reviewed Usha and H.K.'s bankruptcy schedules with the consent of all parties.

35

## CONCLUSION

Based on the foregoing, the Court concludes that Usha is entitled to a nondischargeable judgment on their direct claims under § 523(a)(4) (Categories 6 and 7) in the amount of $35,946, which represents the total amount Patty and Danny embezzled from them. All remaining categories of claims (Categories 1, 2, 3, 4, 5 and 8) are derivative claims, which Usha and H.K. lack standing to assert. The Court further concludes that Usha is not entitled to an award of attorney's fees and that the Court will not impose sanctions for lying under oath. The Court will enter a separate judgment consistent with this memorandum opinion.

_Robert H. Jacobvitz_
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Entered on: August 21, 2015

COPY TO:

Shay E Meagle
Meagle Law, P.A.
6500 Jefferson St. NE, Ste. 260
Albuquerque, NM 87109-3490

George Moore & Arin Elizabeth Berkson
3800 Osuna Rd NE, STE #2
Albuquerque, NM 87109